# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patrick M. B.,                                    Case No. 18-cv-2569 (TNL)

        Plaintiff,

v.                                                **ORDER**

Andrew Saul,
Commissioner of Social Security,[1]

        Defendant.

---

Karl E. Osterhout, Osterhout Berger Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA 15139; and Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401 (for Plaintiff); and

Linda H. Green, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX, 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Patrick M. B. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Mar. 9, 2020). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 14, 17.)  For the reasons set forth below, Plaintiff's motion is **DENIED** and the Commissioner's motion is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI in August 2015, asserting that he is disabled due to, among other conditions, "[a]nxiety," "[d]iabetes, "[r]ecurring [s]urgical [h]ernia," problems with his left knee, and "[t]ennis [e]lbow[]" in both of his elbows.[2]  (Tr. 126; *see* Tr. 13, 141, 142, 156.)  Plaintiff's SSI application was denied initially and again upon reconsideration. (Tr. 13, 139, 141, 155, 156.)  Plaintiff appealed the reconsideration of his SSI determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 13, 191.)

The ALJ held a hearing in September 2017.  (Tr. 13, 94-125.)  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review.  (Tr. 1-12.)  Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.)  The parties have filed cross motions for summary judgment.  (ECF Nos. 14, 17.)  This matter is now fully briefed and ready for a determination on the papers.

## III. LEGAL STANDARD

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "It means—and means only—

---

[2] Plaintiff also alleged disability on the basis of stage II kidney cancer (in remission), having one kidney, high blood pressure, and high cholesterol.  (Tr. 126-27, 142.)

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 1381a; *accord* 20 C.F.R. § 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists

3

in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 1382c(a)(3)(B); *accord* 20 C.F.R. § 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 416.912(a). Plaintiff asserts the ALJ erred at step four by improperly weighing the opinion evidence when determining his residual functional capacity. *See, e.g.*, *Perks*, 687 F.3d at 1092; *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

## IV. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about

his capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 416.946(c).

### A. ALJ's Decision

The ALJ found that Plaintiff "ha[d] the following severe impairments: recurrent incisional hernia; right knee meniscal tear; mild joint space narrowing left knee; bilateral plantar fasciitis; cervical radiculopathy; osteoarthritis right shoulder; obesity; anxiety; and depression," and that none of these impairments when considered individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 15-16.) The ALJ determined that Plaintiff had the residual functional capacity to perform light work[3] and "simple routine tasks." (Tr. 17.) Plaintiff asserts that the ALJ did not properly weigh the opinions of his treating physician and a psychological consultative examiner in determining his residual functional capacity.

### B. Weighing of Opinion Evidence

"A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). "Yet[, this controlling] weight is neither inherent nor

---

[3] The ALJ also included certain postural limitations not at issue: Plaintiff could "occasionally climb ramps/stairs, but never climb ladders/ropes/scaffolds"; could "frequently balance and stoop and occasionally kneel, crouch, and crawl"; was "limited to frequent in front, lateral, and overhead reaching with the right upper extremity"; and "should avoid concentrated exposure to wetness, fumes, odors, dusts, gases, poor ventilation, and workplace hazards." (Tr. 17.)

automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (quotation omitted)).

When a treating physician's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 416.927(c); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). These same factors apply to the opinions of consultative examiners. *See* 20 C.F.R. § 416.927(c) (factors apply in deciding weight "give[n] to any medical opinion").

## C. Light Work

The ALJ determined that Plaintiff was capable of doing light work while his treating physician, Dinesh Chaudhary, MD, opined that he was capable of performing sedentary work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job

> is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b). "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." *Id.* As for sedentary work,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id.* § 416.967(a).

In determining Plaintiff's residual functional capacity, the ALJ gave the greatest weight to the state agency medical consultants, finding their opinions that Plaintiff was capable of performing light work to be generally supported by the medical record and Plaintiff's "strong activities of daily living." (Tr. 20.) Conversely, the ALJ gave "little weight" to Dr. Chaudhary's opinion that Plaintiff was capable of performing no more than sedentary work, finding it to be unsupported by the medical record and Plaintiff's daily activities. (Tr. 20.)

### 1. Medical Evidence

Plaintiff has a history of uncontrolled diabetes and obesity. (*See, e.g.*, Tr. 580, 879, 1069, 1356, 1373, 1438, 1441, 1444.) Plaintiff's diabetes and medical conditions have complicated his efforts to lose weight. (*See, e.g.*, Tr. 99, 575, 577, 582, 847, 1373.)

### a. Recurrent Hernias

#### i. 2009-2013

In 2009, Plaintiff had surgery for a hernia repair, during which a piece of "composite mesh" was "sutured to [his] abdominal wall." (*See, e.g.*, Tr. 649, 665.) In 2012, Plaintiff was seen for "a sore in his right abdominal wall that ha[d] been intermittently draining over the past 2-3 years." (Tr. 665.) Plaintiff had been experiencing "increased pain and more frequent drainage from the site over the past year." (Tr. 665.)

In 2013, Plaintiff was seen for an abdominal wall infection, and concern was expressed that Plaintiff had a biliary cutaneous fistula. (Tr. 649-50; *see* Tr. 433.) Upon further testing and examination, it was determined that Plaintiff had a recurrent hernia as well as a "fistulous tract coming from a chronically infected corner of mesh or sutures at th[e] site." (Tr. 636.) Plaintiff was referred for surgery to have the hernia repaired and the fistulous tract excised. (Tr. 636.) Following surgery, the incision over the former fistula tract reopened and became infected. (Tr. 625-26, 620-21.)

#### ii. 2014

In June 2014, Plaintiff expressed concerns over having another hernia, "report[ing] that he gets occasional bulge and pain at his prior surgical site." (Tr. 566.) During a surgical consultation approximately two weeks later, Plaintiff reported "dull and intermittent" pain. (Tr. 563.) The "[l]ump [wa]s not reducible" upon examination and Plaintiff had tenderness at the previous surgical site. (Tr. 563, 565.) A CT scan showed another hernia, and surgery was again recommended. (Tr. 561, 557, 565.) Following surgery, Dr. Chaudhary noted that Plaintiff "should not lift weight greater than 20-30

pounds for an infinite period of time" due to his recurrent hernias. (Tr. 554.) Dr. Chaudhary also noted that Plaintiff was "at risk for a recurrent hernia due to multiple risk factors." (Tr. 554.)

In early December, Plaintiff reported having "sharp [epigastric] pain which gets worse with heavy lifting." (Tr. 535.) Plaintiff told Dr. Chaudhary that "he ha[d] been cutting wood for wintertime" and was experiencing more pain. (Tr. 535; *see also* Tr. 536.) Dr. Chaudhary advised Plaintiff "to avoid lifting heavy until his symptoms [we]re better." (Tr. 536.)

### iii. 2015

In February 2015, Plaintiff had complaints of severe right abdominal pain, which was made "worse with any kind of movement and activities." (Tr. 523.) Plaintiff "notice[d a] bulge in his right upper abdominal wall at [the] previous surgical site." (Tr. 523.) A CT scan showed a new hernia. (Tr. 517.) Plaintiff was given an abdominal brace and referred to a surgeon. (Tr. 518.) During the surgical consultation, Plaintiff reported some discomfort and it was noted that he "ha[d] a large amount of bulging to the right flank region." (Tr. 513.) The hernia was noted to be "extremely small and not palpable on exam." (Tr. 516.) Surgery was not recommended, and Plaintiff was advised to continue wearing the abdominal brace. (Tr. 516.)

### iv. 2016

In September 2016, Plaintiff presented to the emergency room after "developing increasing pain most notably over the right side of his abdomen" over the past few days. (Tr. 1103.) Upon examination, Plaintiff had tenderness in the right upper and lower

quadrants of his abdomen and "erythema over his right abdominal wall." (Tr. 1108.) Plaintiff "ha[d] a protuberant right abdomen," which "[wa]s remarkably painful to palpation." (Tr. 1108; *see also* Tr. 1179.) A CT scan showed "a sizable inter-abdominal abscess as well as evidence of a subcutaneous abscess." (Tr. 1110; *see also* Tr. 1112-13, 1125.) Plaintiff was hospitalized and underwent surgery. (*See, e.g.*, Tr. 1127-1314.) The abscesses were incised and drained, and part of the infected surgical mesh was removed. (*See, e.g.*, Tr. 1135, 1159, 1164-98, 1203.) Not all of the mesh was able to be removed, however, and it was noted that Plaintiff "may benefit from low-dose antibiotic chronic suppression." (Tr. 1135-36.) Plaintiff was subsequently prescribed cephalexin.[4] (Tr. 1327.)

In December, Plaintiff again had "[s]ignificant bulging [on his] right flank consistent with hernia." (Tr. 1349.) Plaintiff was prescribed a new abdominal binder and a CT scan was ordered. (Tr. 1349.) The CT scan revealed another hernia, this time "containing nonobstructed small bowel and colon." (Tr. 1353.)

### v. 2017

In mid-January 2017, Plaintiff completed a patient questionnaire regarding his pain. (Tr. 1365.) Plaintiff reported that he felt pain in his stomach and knee with his knee causing the most pain. (Tr. 1365.) *See infra* Section IV.C.1.b. Plaintiff rated his average pain at 7 and selected "10 Completely interferes" with his general activity and enjoyment of life. (Tr. 1365.) Plaintiff reported that walking and lifting were difficult for him, and described

---

[4] "Cephalexin is used to treat certain infections caused by bacteria . . . ." *Cephalexin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682733 html (last visited Mar. 9, 2020). Keflex is a brand name for cephalexin. *Id. See infra* n.7.

them as "10 Extremely difficult" over the past week.  (Tr. 1365.)  Approximately two weeks later, during a visit with a diabetes educator, Plaintiff reported that his level of physical activity "varies according to what he is working on in the house, or car, or cutting wood."  (Tr. 1370.)

Plaintiff consulted with a surgeon at the University of Minnesota regarding the hernia in early February.  (*See, e.g.*, Tr. 1437-45.)  Surgery was not recommend due to Plaintiff's weight.  (Tr. 1440-41; *see* Tr. 1377.)  Plaintiff needed to "lose 50-75 lbs before hernia surgery."  (Tr. 1441; *see* Tr. 1377.)  Later that month, Dr. Chaudhary prescribed another abdominal binder for Plaintiff. (Tr. 1378.)  During a subsequent visit with the diabetes educator, Plaintiff reported that he does not have "regular" physical activity, but "[w]orks on cars or fixes things at home."  (Tr. 1380.)  Plaintiff also reported that the abdominal binder limits his activities.  (Tr. 1380.)

In May, Plaintiff again presented to the emergency room with increased abdominal pain in the area of his hernia and a fever.  (Tr. 1396.)  Plaintiff reported that the abdominal binder "improve[d] his pain."  (Tr. 1396.)  A CT scan revealed a "[p]robable hemorrhage, with or without edema, interspersed within the muscular and fascial layers associated with the right lateral hernia."  (Tr. 1403; *accord* Tr. 1407, 1422.)  "This represent[ed] a mixed

picture of trauma versus infection." (Tr. 1404.) Plaintiff was prescribed Flagyl[5] and Cipro.[6] (Tr. 1404.)

During a follow-up appointment in June, Dr. Chaudhary noted that Plaintiff should continue taking Keflex[7] daily for his recurrent hernias with infection and may have to do so on a "life[-]long" basis. (Tr. 1426.)

### b. Knee & Shoulder Pain

Plaintiff has a history of mild degenerative changes in his cervical spine and chronic knee pain. (*See, e.g.*, Tr. 453, 580.)

### i. 2013

In April 2013, Plaintiff "fell off [a] truck [while] unloading wood," landing "on [a] block of wood" and injuring his lower back. (Tr. 421.) At the end of April, he was still in pain from the fall, including his back and right leg. (Tr. 424.) Plaintiff had also injured his left shoulder "while moving a washer." (Tr. 424.) Subsequent imaging showed "[m]oderately severe joint space narrowing within the right hip" and "[m]inimial degenerative change[s]" in Plaintiff's cervical spine. (Tr. 456-57.) In October, Plaintiff "twisted his [left] knee while chopping some wood." (Tr. 592.) An MRI showed mild to moderate arthritis in his left knee and a possible meniscus tear. (Tr. 591-92.)

---

[5] Flagyl is a brand name for metronidazole and is used to "stop[] the growth of bacteria." *Metronidazole*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a689011 html (last visited Mar. 9, 2020).

[6] Cipro is a brand name for ciprofloxacin, which "is used to treat or prevent certain infections caused by bacteria." *Ciprofloxacin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a688016.html (last visited Mar. 9, 2020).

[7] *See supra* n.4.

### ii. 2014

At the end of January 2014, Dr. Chaudhary noted that Plaintiff had "tenderness over his medial and lateral knee joint line" on the left and his "[f]lexion and extension [wa]s slightly restricted because of pain." (Tr. 581.) Plaintiff's left shoulder also had "some restriction of movement." (Tr. 581.) Dr. Chaudhary noted that Plaintiff was currently taking Norco[8] for pain. (Tr. 580.) During his visit with the diabetes educator the same day, Plaintiff reported that he was "not exercising due to knee pain and back pain." (Tr. 582.)

Plaintiff continued having complaints of left-shoulder pain. (*See, e.g.*, Tr. 577-78, 571.) In March, Dr. Chaudhary ordered an x-ray of Plaintiff's left shoulder, which revealed degenerative arthritis in the joint. (Tr. 577-78, 573-74.)

In August, Plaintiff was seen a number of times for pain in his left shoulder. (Tr. 548-54.) Plaintiff reported left "shoulder pain even with [the] slightest movement" and that he was not able to get a glass of water without dropping it due to "the severe pain in his shoulder joint." (Tr. 553.) Upon examination, Dr. Chaudhary noted "severe tenderness in [Plaintiff's] left anterior shoulder joint which g[ot] worse with slight abduction." (Tr. 554.) "Internal and external rotation . . . [of Plaintiff's] shoulder joint [wa]s completely restricted because of . . . severe pain." (Tr. 554.) Dr. Chaudhary continued Plaintiff's pain medication and referred him to orthopedics. (Tr. 554.) Imaging showed osteoarthritis in

---

[8] Norco is a brand name for a combination of hydrocodone and acetaminophen. *Hydrocodone Combination Products*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601006 html (last visited Mar. 9, 2020).

Plaintiff's left shoulder.  (Tr. 551-52.)  After consulting with orthopedics, Plaintiff received an injection in his left shoulder and was referred to physical therapy.  (Tr. 551, 539.)

During a follow-up appointment with Dr. Chaudhary at the end of October, Plaintiff "report[ed] that he has been pretty active at his home trying to cut wood for the winter" and "hurt his bilateral shoulder [sic] from working too much."  (Tr. 537.)  Plaintiff was "cutting [back] now on his work and avoiding heavy lifting so that he does not hurt his shoulders as well as [his] abdomen."  (Tr. 537.)  The injection, pain medication, and physical therapy helped with Plaintiff's pain.  (Tr. 537; *see also* Tr. 540.)

### iii. 2015

At the end of February 2015, Plaintiff was seen again in orthopedics for shoulder pain, but now in his right shoulder.  (Tr. 521.)  His right-shoulder pain was also thought to be attributable to osteoarthritis in the shoulder joint.  (Tr. 521.)  It was noted that Plaintiff had an injection back in September which offered "100% relief for a long time," but the pain was now back.  (Tr. 521.)  Upon examination, Plaintiff had tenderness over the joint, and it was recommended that Plaintiff undergo an "open distal clavicle excision."  (Tr. 521.)  Dr. Chaudhary prescribed an arm sling until surgery.  (Tr. 518; *see* Tr. 507, 501.)

Plaintiff had the open distal clavicle excision near the end of March.  (Tr. 500-06.)  Approximately a week after surgery, Plaintiff followed up with Dr. Chaudhary.  (Tr. 500.)  Plaintiff was "feeling slightly better following the surgery," but "had been in severe pain requiring frequent use of medication."  (Tr. 500.)  Upon examination, Plaintiff was "slightly tender" and his range of motion was "improving."  (Tr. 500.)

In early May, approximately one month after surgery, Plaintiff told Dr. Chaudhary that "his range of movement at his right shoulder joint ha[d] significantly improved," but he did experience pain "when he applie[d] pressure and during activities." (Tr. 498.) Plaintiff also had pain "when he lift[ed] anything heavy to [sic] his right hand." (Tr. 498.) Dr. Chaudhary recommended decreasing Plaintiff's pain medication "as he is doing better." (Tr. 498.) Plaintiff subsequently requested additional pain medication after injuring his right shoulder, back, and abdomen while using a waterslide in June. (Tr. 487.)

### iv. 2016

Plaintiff continued experiencing pain in his right knee, particularly after a fall on the ice in January 2016. (*See, e.g.*, Tr. 881, 889, 906.) Plaintiff experienced no relief following a cortisone injection and Dr. Chaudhary ordered an MRI. (Tr. 890; *see* Tr. 882, 899, 1010.) The MRI showed a tear in the medial meniscus. (Tr. 902.) Upon examination, Plaintiff had "mild edema" in his lower extremities and "some tenderness in the medial aspect of his right knee joint," but there was "no swelling or deformity" in the knee itself and "no restriction of movement." (Tr. 902.) Dr. Chaudhary referred Plaintiff to orthopedics. (Tr. 903.) About 10 days later, Plaintiff returned to Dr. Chaudhary, who noted tenderness and "restricted" range of movement in the knee. (Tr. 906.)

Plaintiff consulted with orthopedics in April. (Tr. 908-17.) Plaintiff rated his pain at "3 to 4 out of 10, but when he puts a lot of weight on it, it can go up to a 6 to 7 out of 10." (Tr. 911.) Plaintiff was initially scheduled to have a knee scope and medial meniscus debridement in mid-May. (Tr. 917; *see* Tr. 911.) When Plaintiff met with Dr. Chaudhary later in April, however, Plaintiff reported that he delayed the procedure until June "because

he wanted to get his wood split . . . and stocked before the fall." (Tr. 921.) Plaintiff told Dr. Chaudhary that he uses the wood to heat his home and "has no one else to do this work." (Tr. 921.) Plaintiff reported that "[h]e ha[d] been splitting wood every day," and his knee "hurts by the end of the day." (Tr. 921.) Dr. Chaudhary noted that Plaintiff "has been limping because of his right knee pain." (Tr. 921.)

At the end of May, Plaintiff had a preoperative appointment with Dr. Chaudhary. (Tr. 1003.) Dr. Chaudhary noted that Plaintiff "has been pretty active physically" and "cuts logs of wood." (Tr. 1004.) Upon examination, Plaintiff had pain and swelling in his right knee. (Tr. 1004.) Plaintiff underwent the right knee scope and medial meniscus debridement approximately two weeks later. (Tr. 1019-23.) The femoral articular cartilage in the medial joint space of Plaintiff's knee was rated as being "[s]everely abnormal (through the subchondral bone)." (Tr. 1021.) During a follow-up appointment with Dr. Chaudhary, Plaintiff reported "feeling much better" after surgery. (Tr. 1043.) While Plaintiff still had pain, "it [wa]s much better than before." (Tr. 1043.) Plaintiff continued to have some swelling in his right leg. (Tr. 1043.)

Plaintiff followed up with Dr. Chaudhary again in August for continued "right knee pain and swelling." (Tr. 1070.) Plaintiff reported having pain "in his knee joint, especially when he bends," and "state[d] that he cannot walk because of his significant pain and discomfort." (Tr. 1070.) An x-ray showed "severe bilateral medial compartment joint space narrowing that ha[d] mildly worsened since 2/15/2016 bilaterally." (Tr. 1085; *accord* Tr. 1086. *But see* Tr. 1074.) Plaintiff also had "[m]ild left knee lateral compartment joint space narrowing." (Tr. 1085; *accord* Tr. 1086.)

Plaintiff attended occupational therapy to evaluate and treat the swelling in his knee. (Tr. 1093.)  During the initial consultation, Plaintiff "report[ed] that the fluid is significant enough that it does limit his mobility" and his ability to complete activities of daily living. (Tr. 1093.)  Plaintiff "had to ask his wife to help him with tying his shoes and putting on his stockings as he cannot bend his knee far enough to complete these activities."  (Tr. 1094.)  On examination, Plaintiff had "[d]ecreased right knee flexion by 20 degrees compared to the left knee associated with fluid accumulation in the right lower extremity." (Tr. 1093.)  There were no strength limitations and "[m]inimal discomfort [was] noted in the calf area" upon palpation.  (Tr. 1093.)  During his next visit with Dr. Chaudhary, Plaintiff reported feeling better with occupational therapy.  (Tr. 1098.)

Plaintiff, however, continued to have pain in his right knee for which Dr. Chaudhary prescribed pain medication.  (*See, e.g.*, Tr. 1343-44, 1354-56, 1387-89.)

## 2.  Plaintiff's Description of His Activities

During a psychological consultative evaluation in December 2015, Plaintiff reported that he enjoyed fishing and fished approximately six times per month for two to three hours at a time in the summer.  (Tr. 848.)  Plaintiff was also "currently supervising a building project on his property."  (Tr. 848.)  Plaintiff "measured and cut[] wood[] while others . . . assembl[ed] the shed."  (Tr. 848.)

In his function reports, Plaintiff reported that he has "issues with getting back up to standing position and often times needed assistance from a chair or person to help [him] get back up."  (Tr. 286.)  Plaintiff also reported difficulty "bending [his] left knee" and had

trouble "controlling more than 10 pounds of weight without being in severe pain." (Tr. 286; *see also* Tr. 305.)

Plaintiff reported that he takes care of his seven-year-old grandson, including "cook[ing], clean[ing] and provid[ing] for him." (Tr. 287; *see also* Tr. 100, 306.) Plaintiff performed chores around his home, including "a little gardening," making fires, mowing, sweeping, washing dishes, doing laundry, and shoveling snow. (Tr. 287; *see also* Tr. 307.) Plaintiff's grandson helped him with his shoes. (Tr. 287, 306.) Plaintiff used a shower chair and assistive bars when bathing and going to the bathroom. (Tr. 287, 306.) Plaintiff was able to drive and use public transportation. (Tr. 289.) He shopped in stores for personal items and groceries approximately twice per month for about two hours at a time and sometimes used a motorized scooter. (Tr. 289, 308.) Plaintiff visited with others four to five times per week. (Tr. 290, 309.) Plaintiff reported that he enjoyed going fishing and went "12 times this summer," but found it "difficult to sit in a boat all day." (Tr. 290.)

At the hearing before the ALJ, Plaintiff testified that he took care of his grandson, who assisted with cooking, doing the dishes, shopping, and other tasks as needed. (Tr. 101, 109, 111, 114.) Plaintiff testified that his "knees are really bad," with his left being worse than the right. (Tr. 108.) Plaintiff also testified that he had trouble bending due to the hernia and infected mesh. (Tr. 109.) Plaintiff's right leg was also swollen from infection. (Tr. 109.) Plaintiff further testified that he had trouble with his hands, feet, and right arm. (Tr. 115-16.)

Plaintiff testified that his abdominal brace helps him "get from point A to point B" and then he needs to sit down. (Tr. 109.) Without his abdominal brace, Plaintiff testified

that it is painful to walk and sometimes his hernia will "bind" and he will go down, crying in pain. (Tr. 109-110, 119.) Plaintiff's hernia stuck "out about six, seven inches from [his] side" if he was not wearing the abdominal brace. (Tr. 109.) Plaintiff was most comfortable sitting in a reclined position. (Tr. 111.)

Plaintiff also testified that he used wood to heat his home. (Tr. 112.) Plaintiff would sit in a chair and split logs so that "they're maybe a pound or two." (Tr. 112.) Plaintiff's grandson and son would assist him. (Tr. 112-13, 117-18.) Plaintiff used a light chainsaw, weighing approximately ten pounds. (Tr. 118.) Plaintiff's son would stack the wood "like a chimney," and Plaintiff would move his chair around the pile while cutting the logs in half. (Tr. 117.) Plaintiff would cut a little bit, set the saw down, rest, and then continue. (Tr. 118.) Plaintiff's son and grandson would haul the wood. (Tr. 113.) Plaintiff testified that it takes him "three days to cut up a tree where it would take [him] three hours before." (Tr. 118.)

### 3. Opinion Evidence

#### a. Dr. Chaudhary

Dr. Chaudhary has been Plaintiff's primary care physician since at least October 2013. (*See, e.g.*, Tr. 615, 868.) In April 2016,[9] Dr. Chaudhary noted that Plaintiff "has recurrent incisional hernia with complications in [the] past concerning for any kind of

---

[9] Dr. Chaudhary also provided a letter dated August 9, 2017, which provided an update on Plaintiff's "chronic health conditions," noting that Plaintiff had consulted with surgeons regarding "his recurrent abdomen wall hernia" and been referred to another "[s]urgery clinic for opinion and further management by . . . [an] infectious disease s[p]ecialist." (Tr. 1446.) Dr. Chaudhary noted that Plaintiff "has been on antibiotics and advised weight management." (Tr. 1446.) Dr. Chaudhary further noted that there were "no [s]urgical interventions [recommended] at this time." (Tr. 1446.) The ALJ also treated this letter as an opinion, observing that the letter "did not mention further limitations." (Tr. 20.)

excessive physical activity." (Tr. 868.)  Dr. Chaudhary also noted that Plaintiff had a "right knee meniscal tear which . . . severely limit[ed] his activities and even ambulation," and was scheduled for surgery to have the tear repaired.  (Tr. 868.)  After Plaintiff was cleared from surgery, Dr. Chaudhary "limited [Plaintiff] to sedentary work lifting 10 lbs occasionally, 5 lbs frequently, [and] being on feet for 2-4 hours and sitting for 6-8 hours."  (Tr. 868.)

#### b.  State Agency Medical Consultants

In relevant part, the state agency medical consultants opined that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently.  (Tr. 135, 151.)  They also opined that Plaintiff was capable of standing and/or walking as well as sitting for six hours in an eight-hour day.  (Tr. 135, 151.)

### 4.  Assertions of Error

There is no dispute that Dr. Chaudhary is an acceptable medical source who treated Plaintiff.  *See* 20 C.F.R. §§ 416.902(a)(1) (identifying licensed physicians as acceptable medical sources), .927(a)(2) ("Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

Plaintiff begins by arguing that it is not clear that the ALJ considered all of the relevant factors under 20 C.F.R. § 416.927(c) when determining what weight to give Dr. Chaudhary's opinion, particularly Dr. Chaudhary's status as a treating physician and that Dr. Chaudhary was the only source who examined Plaintiff.  As stated above, § 416.927 sets forth the manner in which medical opinions are weighed, including that more weight

is generally given to the opinions of treating and examining sources. 20 C.F.R. § 416.927(c)(1), (2). The ALJ explicitly stated that the "opinion evidence" was considered "in accordance with the requirements of 20 CFR 416.927." (Tr. 17.) *See Carlson v. Astrue*, 604 F.3d 589, 595 (8th Cir. 2010) (ALJ's citation to relevant regulation "tends to confirm that the ALJ recognized and applied the correct legal standard"). And, when discussing the weight assigned to the various medical opinions, the ALJ expressly stated that "Dr. Chaudhary treated [Plaintiff]." (Tr. 20.)

Moreover, the regulations do not require the ALJ to *discuss* each factor, only that the factors be considered and the ALJ give "good reasons" for the weight assigned to the opinion of a treating source. *See* 20 C.F.R. § 416.927(c); *Cline*, 771 F.3d at 1103; *see, e.g.*, *Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 (D. Minn. Mar. 19, 2018) ("However, though ALJ Garelick was required to consider all the factors listed in the applicable regulation, he was not required to discuss each of them."); *Roesler v. Colvin*, No. 12-cv-1982 (JRT/JJK), 2013 WL 4519388, at *5 (D. Minn. Aug. 26, 2013) ("But the regulations do not strictly require the ALJ to explicitly discuss each factor. Rather, the regulations assure that the ALJ will always give good reasons for the weight given to a treating physician's opinion." (quotation omitted)).

Here, the ALJ gave little weight to Dr. Chaudhary's opinion because it was not supported by the medical evidence and Plaintiff's daily activities. The Court concludes that the ALJ gave good reasons for assigning little weight to Dr. Chaudhary's opinion and the treatment of Dr. Chaudhary's opinion is supported by substantial evidence in the record as a whole.

Plaintiff argues that there is no inconsistency between Dr. Chaudhary's opinion and the medical evidence. Plaintiff argues that "the record . . . is replete with references to Plaintiff's chronic pain, frequent need for treatment, [and] various treatment modalities which were employed with little or no effect." (Pl.'s Mem. in Supp. at 21, ECF No. 15.) The Court does not doubt that Plaintiff experiences pain. But, "[w]hile pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011).

An ALJ may assign less weight to a treating physician's opinion when that opinion is not supported by objective medical evidence. *See* 20 C.F.R. § 416.927(c)(3); *see, e.g.*, *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (ALJ properly discounted opinion of treating physician where opinion "contrast[ed] sharply with the other evidence of record, and [was]s without substantial support from the other evidence of record," noting claimant's "medical reports revealed, among other things, that he had normal 5/5 motor strength in all extremities, his acuity seemed normal, his reflexes and fine fingering were normal, and he reported feeling fine"); *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected in any treatment notes or medical records").

Plaintiff is essentially asking this Court to draw a different conclusion from the medical evidence than the one reached by the ALJ. But, it is not the function of this Court to reweigh the evidence. *See, e.g.*, *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016);

*Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016).  In discussing the medical evidence, the ALJ acknowledged Plaintiff's struggle with diabetes and weight gain.  The ALJ also recognized that there were occasions where Plaintiff had normal or mild objective findings and those where Plaintiff's conditions required surgical treatment.  The ALJ noted that while Plaintiff "had periodic difficulties with his physical impairments," (Tr. 18-19), he also generally experienced improvement after surgery.  Plaintiff does not contend that the ALJ mischaracterized the medical evidence.  Nor does Plaintiff point to medical evidence showing that his abilities to sit, stand, walk, and lift were more limited than the ALJ's residual-functional-capacity determination.

The ALJ also found that Dr. Chaudhary's opinion was inconsistent with Plaintiff's own activities, such as driving, fishing for long periods of time, and managing a construction project on his property, including measuring and cutting wood.  In doing so, the ALJ properly considered Dr. Chaudhary's opinion in the context of the entire record. *See* 20 C.F.R. § 416.927(c)(4); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control.").  When a treating physician opines that a claimant has greater limitations than the claimant "actually exhibits in [his] daily living, an ALJ need not ignore the inconsistency." *Anderson*, 696 F.3d at 794.  And, an ALJ properly discounts the opinions of a treating physician when such opinions are "contradicted by or inconsistent with other evidence in the record." *Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007); *accord Julin*, 826 F.3d at 1088 (opinions of treating physicians "may be given limited weight if they are . . . inconsistent with the record").

Plaintiff does not deny that he drives, goes fishing, and gathers firewood to heat his home. Rather, Plaintiff characterizes these activities as "sporadic" and "intermittent at best" and, as such, "do not demonstrate that [he] can perform full-time work on a regular basis." (Pl.'s Mem. in Supp. at 22.)

As the ALJ pointed out, Plaintiff had "generally strong activities of daily living." (Tr. 20.) In particular, there are numerous places in the record where Plaintiff reported cutting wood to heat his home. While Plaintiff's son and seven-year-old grandson assisted him with certain aspects, Plaintiff himself used a chainsaw to cut the wood. Further, Plaintiff was able to drive, cared for his young grandson, shopped, cooked, performed household chores, and fished for more than two hours at a time. The record reflects that these activities were not just infrequent or intermittent, but occurred on a regular basis. The ALJ did not err in concluding that Plaintiff's self-reported activities were inconsistent with Dr. Chaudhary's more limited view of his functionality and more consistent with an ability to perform light work. *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) ("Thomas's self-reported activities of daily living provided additional reasons for the ALJ to discredit Dr. Hollis's pessimistic views of her abilities. Thomas's activities—caring for her young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary, among other things— showed that she could work.").

In sum, there is substantial evidence in the record to support the greater weight assigned by the ALJ to the opinions of the state agency medical consultants that Plaintiff was capable of performing light work as being more consistent with the medical evidence

and Plaintiff's daily activities than Dr. Chaudhary's opinion that Plaintiff was limited to sedentary work.

## D. "Simple Routine Tasks"

Plaintiff challenges the ALJ's treatment of Joel Kirchner, PsyD, LP,[10] a psychological consultative examiner, arguing that the ALJ "did not acknowledge or discuss" Kirchner's opinion that Plaintiff's mental impairments might impact his ability to tolerate stress.[11]  (Pl.'s Mem. in Supp. at 24.)

### 1. Kirchner's Opinion & Weight Assigned by ALJ

Plaintiff has a history of depression and anxiety.  (*See, e.g.*, Tr. 343, 348, 401, 608, 615, 815-16, 849.)  These conditions have generally been treated with medication by Dr. Chaudhary.  (*See, e.g.*, Tr. 482, 581, 608, 848; *see also, e.g.*, Tr. 410.)

As part of a psychological consultative examination in December 2015, Kirchner diagnosed Plaintiff with depression and anxiety.  (Tr. 849-50.)  Kirchner opined that Plaintiff

> has the mental capacity to understand, remember, and follow instructions.  His medical and psychological problems might

---

[10] On page 15 of his memorandum, Plaintiff refers to a "Dr. Oddin [sic]."  (Pl.'s Mem. in Supp. at 15.)  Ronald L. Odden, MS, conducted a psychological consultative examination in 2011.  (Tr. 19, 343-45.)  This appears to be an inadvertent typographical error as Plaintiff specifically refers to Kirchner and quotes Kirchner's evaluation elsewhere in the memorandum.  (*See, e.g.*, Pl.'s Mem. in Supp. at 3-4, 24.)

[11] Plaintiff's assertions of error with respect to the treatment of Kirchner's opinion are difficult to follow.  At one point, Plaintiff argues that the ALJ's residual-functional-capacity determination does not address the opinion that "a primary limiting effect of Plaintiff's mental impairment involves difficulty getting along with others."  (Pl.'s Mem. in Supp. at 15.)  Yet, Kirchner opined, and the ALJ acknowledged, that Plaintiff "probably" *would* be able to get along with coworkers, supervisors, and the public.  (Tr. 19, 850.)  It was Odden back in 2011 who opined that Plaintiff "would have some difficulty getting along with coworkers and supervisors at times, due to irritability."  (Tr. 345; *see* Tr. 20.)  *See supra* n.10.  Plaintiff has not developed an argument with respect to the ALJ's treatment of Odden's opinion, focusing instead on Kirchner.  Later, Plaintiff recharacterizes the issue as "not acknowledg[ing] or discuss[ing] that . . . Kir[c]hner went on to state [that Plaintiff's] psychological problems might adversely affect his ability to tolerate the stress commonly found in an entry-level work[place]."  (Pl.'s Mem. in Supp. at 24 (quotation omitted).)

adversely affect his ability to maintain adequate attention, concentration, perseverance, and pace to tasks commonly found in an entry[-]level workplace. He probably has the ability to appropriately relate to coworkers, supervisors, and the public. His psychological problems might adversely affect his ability to tolerate the stress commonly found in an entry[-]level workplace.

(Tr. 850.)

The ALJ gave "some weight" to Kirchner's opinion, finding that it was generally supported by the record, and therefore "limited [Plaintiff] to simple routine tasks." (Tr. 19.) The ALJ mentioned each component of Kirchner's opinion in the decision, but overall gave the opinion reduced weight because "Kirchner did not provide a function-by-function assessment of [Plaintiff's] limitations." (Tr. 19.) The ALJ also relied on evidence in the record that Plaintiff cared for his grandson, including helping with his homework, and managed a construction project on his property.

### 2. Assertions of Error

First, Plaintiff contends that the ALJ "fail[ed] to acknowledge or discuss" Kirchner's opinion that Plaintiff's mental impairments might impact his ability to tolerate stress. (Pl.'s Mem. in Supp. at 24.) But, the ALJ specifically included this portion of Kirchner's opinion in the decision. Thus, there was no error "of omission." (Pl.'s Mem. in Supp. at 25.)

Second, Plaintiff has not articulated what additional functional limitation(s) the ALJ should have included in his residual functional capacity. "It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." *Stormo*, 377 F.3d at 807 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

Kirchner opined that it was *possible* Plaintiff's mental impairments would impact his ability to tolerate stress, and the ALJ subsequently limited Plaintiff to "simple routine tasks." *See McCoy*, 648 F.3d at 615 (Courts "review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but . . . do not require an ALJ to mechanically list and reject every possible limitation."). Plaintiff has not explained how this case would have been decided differently had the ALJ accorded greater weight to Kirchner's opinion.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 14) is **DENIED**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 17) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March____30____, 2020                 _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota


                                             *Patrick M. B. v. Saul*
                                             Case No. 18-cv-2569 (TNL)